Eric GAMES, Plaintiff,

v.

Lauro CAVAZOS, Secretary United States Department of Education, in his official capacity, and United Student Aid Funds, Inc., Defendants.

Civ. A. Nos. 88–516/88–551 MMS.

United States District Court,
D. Delaware.

May 23, 1990.

O. Randolph Bragg and John X. Denney, Jr. of UAW–GM Legal Services Plan, Newark, Del., for plaintiff.

William C. Carpenter, Jr., U.S. Atty., and Patricia C. Hannigan, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., for defendant Cavazos.

Kevin G. Healy of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendant United Student Aid Funds, Inc.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This action is two consolidated cases filed by plaintiff Eric Games against the United States Department of Education ("ED") and United Student Aid Funds, Inc. ("USA Funds"), a guarantee agency participating in the federal Guaranteed Student Loan Program (also known as the Robert T. Stafford Student Loan Program).

In Civil Action No. 88–516, Games alleges both ED and USA Funds committed various procedural due process violations in connection with the involuntary interception and application of his 1987 federal income tax refund towards repayment of his federally guaranteed student loan. Games has moved for summary judgment on his claim. Both defendants have also moved for summary judgment in Civil Action No. 88–516. Civil Action No. 88–551 is a suit by Games against defendant USA Funds for alleged violations of the Federal Debt Collection Practices Act, 15 U.S.C.A. §§ 1692 *et seq.* Games has moved for partial summary judgment on the merits of his claim. USA Funds has moved for summary judgment in its favor. USA Funds has also filed a counterclaim against Games seeking the outstanding balance of his student loan, interest, costs and attorneys' fees. USA Funds has moved for summary judgment on its counterclaim.

The two cases and the counterclaim were consolidated for all purposes. Stipulated Order of Consolidation (Dkt. 28). The court has jurisdiction pursuant to 28 U.S.C.A. § 1331. Extensive briefing was filed by the parties, and the court heard oral argument on all motions on March 15, 1990. The court will consider the briefing and evidence submitted by all parties on the various summary judgment motions to be a single summary judgment record.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "The filing of cross-motions for summary judgment does not require the Court to grant summary judgment for either party." *Krupa v. New Castle County,* 732 F.Supp. 497, 512–13

(D.Del.1990) (quoting *Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 245 (3d Cir. 1968)). This is because each party may base its motion on different legal theories involving different material facts. *Id.,* 732 F.Supp. at 513. Further, different reasonable inferences may be drawn from the same facts. When there are no issues of fact and no conflicting inferences, the court may render summary judgment as a matter of law.

A factual dispute between the parties will not defeat a motion for summary judgment unless it is both *genuine* and *material.* *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A dispute over facts is "material" if, under the substantive law, it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. at 2510. A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-movant. *Id.*

Absent a genuine issue of material fact, summary judgment will be entered "against a party who failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The same burdens exist on cross-motions for summary judgment. *Peters Tp. School Dist. v. Hartford Acc. & Indem.,* 833 F.2d 32, 34 (3d Cir.1987).

The "very mission" of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R. Civ.P. 56 advisory committee note to the 1963 Amendment. If wisely applied, the summary judgment procedure will eliminate useless trials. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* § 56.02[1] (1988). However, summary judgment is not a substitute for trial and should not be used as a shortcut to avoid trial when a genuine issue of material fact remains in dispute.

## FACTS

The basic factual background of this case is set forth here. Other facts surrounding plaintiff Games' student loan will be discussed in greater detail where relevant.

Plaintiff Games is the recipient of a federally guaranteed student loan under the Robert T. Stafford Student Loan Program. Games applied for a loan in January 1985, Appendix to USA Funds' Opening Brief at A–1–3 (Dkt. 52) (hereinafter cited as "Dkt. 52 at A–___"), and received the loan from Wilmington Trust Company (the "lender") in February 1985 to attend Goldey Beacom College. The loan was guaranteed by defendant USA Funds, a private, not-for-profit corporation which operates as a guarantee agency pursuant to the Higher Education Act, 20 U.S.C.A. §§ 1071 *et seq.*

Under the terms of the loan, Games was required to begin repayment of the principal six months after the date on which he ceased to be enrolled in college on at least a half-time basis. Promissory Note and Notice of Loan Guarantee and Disclosure Statement, Dkt. 52 at A–2–3. Games' six-month grace period began on May 31, 1985, when plaintiff ceased enrollment at Goldey Beacom College on even a half-time basis. Notice from Goldey Beacom College to Wilmington Trust Co. (Oct. 24, 1985), Appendix to Dept. of Education's Opening Brief in C.A. No. 88–516 at A–14 (Dkt. 48A) (hereinafter "Dkt. 48A at A–___"). Therefore, he should have begun repayment no later than December 1, 1985.

Games failed to make any payments. Plaintiff claims he never received any notices from Wilmington Trust Co. Appendix to Plaintiff's Briefs at A–212 (Dkt. 60) (hereinafter "Dkt. 60 at A–___") (deposition of Eric Games) ("Q. Did you receive a notice from Wilmington Trust with regard to repayment of your student loan? A. No, I did not."). The lender, however, asserts that at least four notices were sent. ED entered copies of four alleged notices into the summary judgment record. Dkt. 48A at A–8–12. However, defendants failed to offer any proof that the notices were in fact mailed.

Wilmington Trust declared the loan in default on May 15, 1986. *See* Notice of Default, Dkt. 48A at A–7; Letter from Noel C. Burnham, Vice President, Wilmington Trust Co. to Eric Games, Dkt. 60 at A–468. Pursuant to its guarantee obligation, USA Funds paid the defaulted loan ($2615.07) on June 30, 1986, and Wilmington Trust transferred title to the loan to USA Funds. Dkt. 48A at A–1. USA Funds was reimbursed by the ED under its reinsurance agreement with ED. Opening Brief of the Department of Education at 10 (Dkt. 48) (hereinafter "Dkt. 48 at ___"); Dkt. 48A at A–1. In accordance with its contractual obligations with ED, USA Funds conditionally assigned the loan to ED on October 2, 1987. Dkt. 60 at A–45. Also as part of its contractual arrangements with ED, USA Funds generated and sent to Games on USA Funds' letterhead the following form letter ("65–day letter") provided by ED dated October 1, 1987:

The U.S. Department of Education (ED) holds a defaulted student loan for which you are responsible. During 1986 and 1987, the IRS collected many ED student loan debts by deducting the amount of the debt from income tax refunds to which debtors were entitled. The law does not authorize the IRS to deduct student loan debts from refunds during 1988; however, if a new law is enacted to authorize the IRS to deduct debts from refunds in 1988, ED intends to collect student loan debts again in 1988 by deductions from tax refunds.

ED has authorized us to notify you that, if the law is enacted to authorize collection from refunds in 1988, ED will refer your student loan debt to the IRS unless you pay this debt in full, or make satisfactory arrangements to repay it. The IRS will deduct the amount of the debt, plus a servicing fee, from any income tax refund to which you may be entitled during 1988. If you file a joint return, IRS will notify your spouse at the time it makes this deduction of the steps to take to protect the spouse's share of the refund.

ED has authorized us to accept payment on this debt. To pay this debt in full, send a check or money order to the agency(s) listed below.

You can object to this collection action if you believe that this debt is not past-due or not legally enforceable. ED has authorized us to make your records regarding the debt available, to accept repayment agreements, and to review your debt. If we review your debt and your are dissatisfied with our decision, you may then request a review by an ED official.

If you want to inspect records, to enter into a repayment agreement, or to receive a review of your objections to collection of this debt, you must make your request according to ED rules. A copy of these rules is enclosed with this notice. ED rules require that you request a review within 65 days of the date printed on this letter. Your request may be disregarded if you do not file your requests before the deadlines in these rules, or if your requests do not contain the information and documents that the rules require. All requests must be sent to the address listed below.

Exh. A, Amended Complaint (Dkt. 40) (hereinafter referred to as the "65–day letter"). The notice listed a collection agency, Diversified Collection Services ("Diversified"), as the contact. Attached to the notice was a copy of the relevant regulations regarding the tax refund intercept program for that year, 51 Fed.Reg. 24099–24102 (1986) (codified at 34 C.F.R. part 30). Games states he did not receive this notice until December 1987. Affidavit of Eric E. Games at ¶ 37, Dkt. 60 at 457.

Games through his attorney sent a letter dated January 8, 1988 to Diversified requesting documentation and an oral hearing regarding his objections to interception of his tax refund. Dkt. 52 at A–13–15. Diversified belatedly responded to this letter, sending the requested documents by letter dated March 30, 1988. Dkt. 60 at A–448. Diversified apparently treated the letter from Games' attorney as a request for documents only and failed to forward Games' request for a review to USA Funds. Consequently, no review in connec-

tion with Games' response to the 65–day letter was ever conducted.

USA Funds sent Games a second notice dated January 27, 1988. This notice stated:

The U.S. Department of Education has identified you as a current or former U.S. government employee who is in default on a student loan held by United Student Aid Funds, Inc.

United Student Aid Funds, Inc. and its collection agents have made numerous attempts to contact you and establish satisfactory repayment arrangements, but you have continued to ignore your responsibility to repay this debt. This notice represents your last opportunity to make payment in full or satisfactory arrangements to repay this debt. You have *60* days from the date of this letter to comply. Should you fail to comply, we are prepared to take all necessary actions to collect your account. The Department of Education has the authority to turn over financial information regarding your account to your employing agency for offset of your salary at the rate of 15 percent of your disposable pay per pay period until the debt is satisfied. In order to avoid this action by the U.S. Department of Education, either: (1) contact this office at the telephone number listed in the upper portion of this notice to make satisfactory repayment arrangements; or (2) send payment in full to the address listed in the upper portion of this notice. Your check must reflect your full name and social security number in order to be properly credited to your account. Your payment must arrive at that address within *60* days from the date of this notice.

As I am sure your realize, it would be advantageous for you to take the necessary steps to avoid salary offset.

Exh. B of the Amended Complaint (Dkt. 40) (hereinafter referred to as the "salary offset notice"). The notice listed USA Funds' address and phone number as the contact.

On May 30, 1988 the Internal Revenue Service notified Games that his 1987 tax refund, amounting to $604.16 had been intercepted and applied toward repayment of his student loan. Dkt. 60 at A–12. Games filed Civil Action No. 88–516 on September 16, 1988. (Dkt. 1).

THE DUE PROCESS CLAIM

Games alleges that both the 65–day letter and the failure of the defendants to provide him with a hearing prior to the interception of his tax refund violated his procedural due process rights under the fifth amendment of the United States Constitution. He requests declaratory relief, injunctive relief prohibiting ED from accepting or retaining Games' 1987 income tax refund, and monetary relief in the amount of $604.12 plus interest, costs and attorneys' fees. He also requests that the court enjoin ED from participating in the federal Tax Refund Intercept Program until its procedures are declared constitutionally adequate. For the reasons stated herein, Games' motion for summary judgment will be denied. Defendants' motion for summary judgment will be granted.

*Statutory, Regulatory and Contractual Framework*

Games' 1987 tax refund was intercepted pursuant to 31 U.S.C.A. § 3720A, which provides in relevant part:

(a) Any Federal agency that is owed a past-due legally enforceable debt ... by a named person shall, in accordance with regulations issued ... notify the Secretary of the Treasury of the amount of such debt.

(b) No Federal agency may take action pursuant to subsection (a) with respect to any debt until such agency—

(1) notifies the person incurring such debt that such agency proposes to take action pursuant to such paragraph with respect to such debt;

(2) gives such person at least 60 days to present evidence that all or part of such debt is not past-due or not legally enforceable;

(3) considers any evidence presented by such person and determines that an amount of such debt is past due and legally enforceable;

. . . .

(c) Upon receiving notice from any Federal agency that a named person owes to such agency a past-due legally enforceable debt, the Secretary of the Treasury shall determine whether any amounts as refunds of Federal taxes paid, are payable to such person. If the Secretary of the Treasury finds that any such amount is payable, he shall reduce such refunds by an amount equal to the amount of such debt, pay the amount of such reduction to such agency, and notify such agency of the individual's home address.

The regulations promulgated by IRS pursuant to section 3720A(d) provide that Federal agencies may refer debts

[w]ith respect to which the agency has given the taxpayer at least 60 days to present evidence that all or part of the debt is not past-due or legally enforceable, has considered evidence presented by such taxpayer, and determined that an amount of such debt is past-due and legally enforceable;

. . . . .

With respect to which that the agency has notified, or has made a reasonable attempt to notify, the taxpayer that—

(i) The debt is past due, and

(ii) Unless repaid within 60 days thereafter, will be referred to the Service for offset against any overpayment of tax. . . .

26 C.F.R. § 301.6402–6T(b)(4) & (6) (1987).[1] ED also promulgated rules governing offset. ED's rules required that:

(b) The written notice informs the debtor regarding—

(1) The nature and amount of the debt;

(2) The Secretary's intent to collect the debt by offset;

(3) The debtor's opportunity to—

(i) Inspect and copy Department records pertaining to the debt;

(ii) Obtain a review within the Department of the existence or amount of the debt; and

(iii) Enter into a written agreement with the Secretary to repay the debt;

(4) The date by which the debtor must request an opportunity set forth under paragraph (b)(3). . . .

34 C.F.R. § 30.22(b) (1987).

USA Funds is a private, not-for-profit corporation which operates as a guarantee agency participating in the Stafford Student Loan Program pursuant to the Higher Education Act, 20 U.S.C.A. §§ 1071 *et seq.* The Guaranteed Student Loan Program (also known as the Stafford Student Loan Program or "GSL Program") "makes low interest loans available to students to pay for their costs of attending postsecondary [sic] schools. Lenders loan their own funds and ... a guarantee agency insures against loss." 34 C.F.R. § 682.100(a) (1984).[2] Under the program, the Federal Government reimburses State or private non-profit guarantee agencies for all or part of insurance claims they pay to lenders. 34 C.F.R. § 682.100(a)(1) (1984).

Generally, a qualified student such as Eric Games receives a loan from an ordinary lender, such as a bank (in this case, Wilmington Trust Co.) to attend an eligible institution of higher learning (here, Goldey Beacom College). The loan is insured by a State or private guarantee agency, such as USA Funds, which enters into various contractual arrangements with ED.

USA Funds agreed to participate in the federal Tax Refund Intercept Program ("TRIP program") for the 1987 tax year. Letter to Rosemary Beavers, Student Receivables Branch, ED from James C. Lintzenich, Senior Vice–President and Treasurer, USA Funds (Sept. 14, 1987), Dkt. 48A at A–42. Its participation in the program consisted of assigning to ED any defaulted loans on which ED had paid a reinsurance claim and generating a one-page form letter provided by ED (the "65–day letter") to each debtor whose account is assigned to ED. USA Funds was autho-

---

**1.** The 1987 Code of Federal Regulations was applicable to the interception of Games' 1987 federal income tax return.

**2.** The 1984 Code of Federal Regulations was in effect at the time plaintiff Games applied for and received his loan.

rized to resolve complaints and inquiries from debtors responding to the 65–day letter. Appendix 1, Dkt. 52 at A–46–47, A–53. The notice dated October 1, 1987 and received by Games was one of the 65–day letters generated by USA Funds at ED's behest. After offset has occurred, ED reassigns any outstanding balance to USA Funds for further collection activity. Appendix 1, Dkt. 52 at A–50.

USA Funds contracted with independent collection agencies to perform certain ministerial tasks in connection with USA Funds' obligations under the TRIP program. Diversified was one such agency. Diversified received inquiries from borrowers who received 65–day letters, entered into repayment arrangements with borrowers, provided documentation to borrowers who so requested, and forwarded requests for review to USA Funds. Diversified did not have authority to review the loans. Dkt. 60 at A–123–125 (deposition of Kevin Tharp).

*Analysis*

When an individual alleges violation of his procedural due process rights, there are two inquiries: (i) Is a hearing required? and (ii) What kind of hearing is required? *Morrisey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("Once it is determined that due process applies, the question remains what process is due."). Individuals are entitled to procedural due process when government decisions deprive them of life, liberty or property interests. In this case, there is no question that Games has a property interest in his tax refund, and is entitled to due process. The Court must determine the amount of process to which Games was entitled.

Procedural due process means only an opportunity to be heard. The opportunity to be heard breaks down into two components, notice and a hearing:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978) (quoting *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). The concept of due process is a flexible one, and the amount of process that is due depends upon the type and context of the deprivation alleged. *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

### 1. *The 65–day Letter*

Plaintiff challenged the constitutional adequacy of the 65–day letter as not reasonably calculated, under all the circumstances, to apprise him of the pendency of the tax refund intercept and afford him an opportunity to present his objections because: (i) it failed to provide a list of possible defenses to the tax refund intercept; (ii) its explanation concerning the reauthorization of the TRIP program for 1988 was confusing and misleading; (iii) it failed to inform him that he had a right to consult counsel; and (iv) it failed to explain adequately the procedures for objecting to the intercept by attaching a copy of the relevant regulations rather than explaining them in layman's terms.

At the outset, the court has grave concerns about whether Games has standing to raise these issues. The constitutional component of standing requires a party to show that he has suffered some injury that can fairly be traced to the challenged action and is likely to be redressed by a favorable decision by the court. *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) ("The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief"); *Valley Forge Christian College v. Americans United For Separation of*

*Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Games' loss of his tax refund is certainly a cognizable injury. However, that injury is not fairly traceable to the alleged constitutional deficiencies of the 65–day letter. For instance, Games in fact responded to the 65–day letter and objected that his debt was not past-due or legally enforceable. His sole defense to the offset was that he was improperly denied deferment causing his loan to be wrongly declared in default. Games has not suggested any defense which might have been listed by the letter on which he could have relied. Consequently, Games' injury is not fairly traceable to the failure to list possible defenses in the 65–day letter. *See Jones v. Cavazos*, 889 F.2d 1043 (11th Cir.1989). Likewise, since Games responded to the 65–day letter, the language in the letter addressing the probability that TRIP would be reauthorized for the 1987 tax year did not mislead Games into sleeping on his rights. Further, Games contacted his attorney upon receipt of the 65–day letter. Consequently, the letter did not mislead him into failing to consult legal counsel. Finally, Games objected to the intercept and sought review in the appropriate manner. If Games was wrongfully deprived of his tax refund, his injury is the result of the failure of defendants to provide him with a hearing, not from any alleged deficiency in the 65–day letter. It follows that his alleged injury is not fairly traceable to the contents or omissions of the letter, and Games lacks standing to challenge the constitutional sufficiency of the 65–day letter.

■ In the alternative, the court holds the notice provided by the 65–day letter is not constitutionally deficient. Games' first complaint about the letter is that it denies him due process by failing to provide a list of possible defenses to offset. The Third Circuit Court of Appeals recently decided the same issue with regard to TRIP notices to recover delinquent child support payments. *Anderson v. White*, 888 F.2d 985 (3d Cir.1989). In *Anderson*, the Third Circuit considered the adequacy of the notice and hearing procedures followed in Pennsylvania when the IRS intercepts the tax

refunds of obligated parents who are delinquent in child support payments. The child support TRIP program is administered by state and local government units in cooperation with the IRS. The states apply the intercepted refund money against welfare benefits previously paid to delinquents' children or they distribute the proceeds to the persons with lawful custody of the children. *Id.* at 988.

The governing federal statute requires that prior to offset the obligated parent must be "instruct[ed] ... of the steps which may be taken to contest the State's determination that past-due support is owed or the amount of past-due support." 42 U.S.C.A. § 664(a)(3)(A) (quoted at *Anderson*, 888 F.2d at 988 n. 3). The notice sent by the Pennsylvania authorities did not provide a list of possible defenses, nor did the applicable statutes and regulations require such a list. *Anderson*, 888 F.2d at 989. Plaintiffs in *Anderson* contended that Due Process requires more than the procedures required by the statutes and regulations. The court disagreed. Noting that "[t]he Supreme Court has never required that pre-hearing notices contain a list of potential defenses or explain available hearing procedures in intricate detail in order to meet due process standards," the appellate court held that the failure to provide a list of possible defenses did not violate the due process rights of obligated parents. *Id.* at 992.

The parties in the case at bar submitted supplemental briefing addressing the appellate court's decision in *Anderson*. Plaintiff Games argues that this case is distinguishable from *Anderson* and that the Third Circuit's decision in *Finberg v. Sullivan*, 634 F.2d 50 (3d Cir.1980), should control. In the *Finberg* case, the appellate court held that the failure to list possible defenses in a garnishment notice violated due process. *Finberg* involved post-judgment garnishment of a debtor's bank accounts. The garnishment notice failed to inform the garnishee that federal law exempted Social Security benefits and that Pennsylvania law exempted $300 from garnishment. Nor was the debtor informed of

procedures available for obtaining release of her exempt property. *Id.* at 52. Quoting the oft-cited language of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), that due process requires notice to be "reasonably calculated, under all circumstances, to ... afford [interested parties] an opportunity to present their objections," the court noted that "[k]nowledge of these exemptions is not widespread, and a judgment debtor may not be able to consult a lawyer before the freeze on the bank account begins to cause serious hardships." *Finberg*, 634 F.2d at 61–62. The court also stated that conveying the additional information would not be a great burden on the state. *Id.* The court concluded that the post-judgment garnishment notice must include information regarding exempted property and procedures to contest garnishment in order to be "reasonably calculated under all circumstances to ... afford an opportunity to present ... objections."

The court in *Anderson* distinguished *Finberg*, reasoning:

> These [obligated parents] argue the TRIP pre-offset notice should have advised them of the defenses of incorrect identification of the person owing child support, absence of any court order directing payment of child support and inaccuracy in the amount of child support past due. Basically, the defenses boil down to "I don't owe child support or I don't owe that much".... Those defenses should be evident to the recipient of a TRIP notice. They are thus unlike the exemptions from garnishment that we considered in *Finberg*.

*Anderson*, 888 F.2d at 993 (footnote detailing defenses in *Finberg* omitted).

Games argues the defenses to offset of student loans are more like the exemptions to garnishment in *Finberg* than the defenses to child support obligations in *Anderson* and should thus be listed in the 65–day letter.[3] However, the defenses cited by Games essentially boil down to the single defense stated in the 65–day letter: namely, that the debt is not a past-due, legally enforceable debt. *Finberg* and *Anderson* both turned on the likelihood that the debtor would be aware of possible defenses to collection of the debt. Student loan debtors such as Games sign a promissory note setting forth the conditions of the loan. This promissory note includes information as to the date the note comes due, default and deferment. See Dkt. 52 at A–2. These student borrowers are on notice from the outset of conditions that would prevent the loan from becoming a past-due, legally enforceable debt. Student loan debtors are very likely to be aware of whether the debt is past-due and legally enforceable. The defenses in this case would certainly be more evident to student debtors than the exemptions in *Finberg* were to the garnishee. I conclude that considerations of due process do not require that the 65–day letter contain a non-exhaustive list of defenses.

Games next complains the 65–day letter was confusing and misleading in two ways. First, he asserts the notice's statement that the TRIP had not yet been authorized for 1988 was confusing because it made him unsure what action, if any, would or could be taken against him and minimized the need to respond. Second, Games complains the notice was confusing because it failed to state that he could retain an attorney and that he could present documentary evidence.

---

**3.** Games details some of the possible defenses he contends should be listed in the 65–day letter as follows:
—Deferment due to military service or other reasons,
—Expiration of the applicable Statute of Limitations,
—Discharge in bankruptcy,
—Failure of the educational institution to provide the educational or training program sought,

—Failure of the lending institution to attempt to collect a debt as required by the regulations,
—Failure to assign the obligation to the U.S. Department of Education, etc.
Supplemental Brief in Support of Plaintiff's Motion for Summary Judgment in C.A. No. 88–516 at 3–4 (Dkt. 82).

Games' own actions contradict his contentions. The language in the notice addressing the probability that TRIP would be reauthorized for 1988 did not mislead Games into sleeping on his rights. By plaintiff's own account, he responded to the 65–day letter within a month of receiving it. Furthermore, Games' first impulse was to contact his attorney. Consequently, the letter did not mislead him into failing to consult legal counsel.

Neither the language concerning reauthorization of TRIP nor the failure to inform borrowers of their right to consult an attorney constitutes a constitutional violation. In determining whether a violation of procedural due process has occurred, the court must make a case-by-case analysis. In the landmark case *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the United States Supreme Court set forth the standard which the lower courts follow in analyzing alleged due process violations:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Games alleges the language in the 65–day letter was confusing because it indicated merely the possibility that offset *might* occur. He complains that he never received actual notice that the TRIP program was in fact reauthorized and that interception *would* occur. ED explained in its brief that the statements concerning the probability the TRIP program would be reauthorized resulted from a necessary balancing of the government's interest in continuing the offset program with the debtors' interest in a full period for notice and review. Dkt. 48 at 38. IRS and ED regulations require that the pre-offset notice be sent at least 60 (IRS) or 65 (ED) days prior to referral of the debt to IRS for intercept of the debtor's tax refund offset in order to provide debtors with adequate notice of and opportunity to respond. The only timely way to provide such notice was to send the offset notices in October, prior to reauthorization of the TRIP program. ED argues that the language in the 65–day letter fully indicated ED's intent to intercept borrowers' tax refunds and clearly conveyed to the recipients the need to respond to the letter to prevent offset from occurring.

A taxpayer has a property interest in his tax refund sufficient to entitle him to the protections of procedural due process before he is deprived of his refund. It follows that plaintiff satisfies the first prong of the *Mathews v. Eldridge* test. Plaintiff alleges as to the second prong that there is some risk of erroneous deprivation of his tax refund because the language in the 65–day letter could cause him to believe response to the letter was unnecessary. However, Games was not in fact mislead into sleeping on his rights. Games' response to the 65–day letter is evidence that the risk of erroneous deprivation due to the allegedly misleading language of the letter is small. Under the third prong of the *Mathews v. Eldridge* test, the court must consider the relative cost and benefit of additional procedures. Games asserts that ED should have sent a second notice informing borrowers that reauthorization had in fact occurred. In so doing, however, ED would likely have been in violation of its own regulations requiring 65 days' notice, since ED is required to refer to the IRS all accounts to be collected by offset in a particular year by the beginning of January. *See* Declaration of Jack Reynolds at ¶ 12, Dkt. 48A at 37. This would have rendered ED's participation in TRIP for that year invalid, causing ED to forego the $115 million it collected by tax refund offset of Guaranteed Student Loan accounts in 1988. Declaration of Jack Reynolds at ¶ 9, Dkt. 48A at A–36. The burden on plaintiff Games and other debtors caused by the possibly confusing language in the notice is not so great as to

justify such an expense. The *Mathews v. Eldridge* balance compels a finding that the language in the notice concerning reauthorization of TRIP did not violate plaintiff's due process rights.

Secondly, Games complains the 65–day letter was confusing because it failed to state that he could retain an attorney and that he could present documentary evidence. To the extent he complains that the letter failed to state that he could present documentary evidence, Games is simply incorrect. The letter and the regulations accompanying it clearly contemplated the submission of documents by debtors opposing the intercept.

The failure to positively state that the debtor may retain an attorney if he/she so desires is not a due process violation. This is not a case in which the debtor was told that he was not allowed to retain an attorney to represent him in this matter, a statement which probably would be a due process violation. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Rather, the letter simply failed to inform him that he could retain an attorney. Again, Games was not mislead by the omission because he *did* in fact retain counsel in response to the 65–day letter. Second, the notice upheld in *Anderson* also failed to inform debtors that they could be represented by counsel. Although the *Anderson* opinion is silent on this point, the issue was in fact raised before the appellate court in *Anderson*. Transcript of oral argument, *Games v. Cavazos*, C.A. Nos. 88–516/88–551 MMS (Consolidated) at 23 (March 15, 1990) (Dkt. 88) (hereinafter "Transcript at ...."). The appellate court's approval of the notice indicates that it did not consider a statement that debtor could consult counsel to be required by due process considerations.

Finally, Games argues that the 65–day letter violated his due process rights because it failed to set forth the procedures for objecting to the intercept and getting a review and because the regulations attached to the letter were confusing to lay debtors. The 65–day letter contained the following statements with regard to the possibility of contesting the intercept:

> You can object to this collection action if you believe that this debt is not past-due or not legally enforceable. ED has authorized us to make your records regarding the debt available, to accept repayment agreements, and to review your debt. If we review your debt and you are dissatisfied with our decision, you may then request a review by an ED official.
>
> If you want to inspect records, to enter into a repayment agreement, or to receive a review of your objections to collection of this debt, you must make your request according to ED rules. A copy of these rules is enclosed with this notice. ED rules require that you request a review within 65 days of the date printed on this letter. Your request may be disregarded if you do not file your requests before the deadlines in these rules, or if your requests do not contain the information and documents that the rules require. All requests must be sent to the address listed below.

Accompanying the letter was a copy of the IRS and ED regulations detailing the procedure for obtaining review of the debt. Games complains that the regulations were "indecipherable" to laymen. He asserts the regulations were so confusing that the only information given debtors concerning review procedures was that information provided by the text of the letter quoted above. Games argues that the text of the letter was constitutionally insufficient because it did not provide enough information with respect to procedures for obtaining a review of the debt.

The Third Circuit Court of Appeals' decision in *Anderson*, however, indicates that the text of the 65–day letter standing alone was sufficient to inform Games of the procedure for obtaining a review. The notice in *Anderson* stated:

> You have a right to contest our determination that this amount of past-due support is owed. You may request an administrative review by contacting us no later than November 27, 1987 at the address or phone number listed above....

All requests for administrative review must be made by contacting the agency listed above.

*Anderson*, 888 F.2d at 989. The appellate court found this notice to be constitutionally sufficient:

These notices not only informed them that TRIP actions were pending and that their 1987 tax refunds could be intercepted pursuant to the program, but they also gave them timely advice that administrative review was available and how to go about getting it. The notices advised them that they had a right to seek review from [the] local agency to correct any errors in the preliminary determination that they were delinquent in meeting child support obligations and that their tax refunds were therefore subject to interception and application against their delinquencies. Since the notices also told [plaintiffs] how to contact [the local agency], they were reasonably calculated to adequately inform them of the impending TRIP actions as well as procedures for challenging them.

*Id.* at 992. Under the reasoning in *Anderson*, the 65–day letter adequately informs debtors of how to go about getting a review, even accepting without deciding Games' allegation that the accompanying regulations were indecipherable to a layman. In summary, the 65–day letter was reasonably calculated, under all the circumstances, to apprise student loan debtors of the pendency of tax refund interception and to afford them an opportunity to present their objections. I turn now to Games' allegations concerning the adequacy of the hearing procedures themselves.

### 2. *The Hearing Procedures*

■ Plaintiff was never granted a hearing in connection with his written response to the 65–day letter. This was apparently the result of a miscommunication between USA Funds and Diversified. Games alleges that the failure to grant him a hearing violated his due process rights.[4]

As previously stated, USA Funds employs a number of collection agencies, including Diversified, to receive responses to the 65–day letter. The collection agencies are authorized to enter into repayment agreements, to provide copies of documents requested by debtors and to forward requests for review to USA Funds. Dkt. 48 at 40–41 & n. 14.[5] Games through his attorney sent to Diversified a letter dated January 8, 1988 (received by Diversified January 13, 1988) requesting documents and a review. Dkt 60 at A–419–421 & 442. Diversified apparently failed to forward Games' request for a review and treated the communication as simply a request for documents. Dkt. 48 at 40–41. Plaintiff does not dispute this version of events. He concedes that the failure to grant him a pre-deprivation hearing was not intentional and resulted from negligence on the part of Diversified or USA Funds. Transcript at 6.

---

4. Defendants ED and USA Funds urge a kind of "harmless error" analysis in connection with this claim. They assert that Games' only defense to the intercept is his argument that the loan was not past due and legally enforceable because it was invalidly placed in default status when he was wrongly denied a deferment for the time he spent in the Delaware National Guard. Defendants point to the fact that USA Funds reviewed precisely this issue in connection with an attempt by Games to have the loan repurchased and taken out of default status. *See* Letter from Karri L. Hofer, Default Collections Representative, USA Funds to John X. Denney, Esq. (February 18, 1988) (finding the loan was validly placed in default status), Dkt. 48A at A–28. ED and USA Funds argue that the failure to grant a second review of the same question in connection with TRIP was harmless.

Taxpayers are entitled to procedural due process in connection with the deprivation of their tax refunds by the government. The mere happenstance that Games received a prior review of his loan in connection with his efforts to bring the loan out of default status is irrelevant to his due process rights in connection with the deprivation of his tax refund. The court therefore rejects defendants' "harmless error" analysis.

5. By including the name and address of the collection contractor on pre-offset notices it sends to debtors whose accounts have been previously placed with a contractor for collection Education [and USA Funds] merely designates that collection contractor as the contact and conduit through which any requests for review, for documents, and for repayment terms, should be funneled.
ED's Reply Brief for C.A. No. 88–516 at 18 (Dkt. 63).

The Supreme Court has held that deprivation of property under color of law without a hearing is not a due process violation when it occurs because of negligence. *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986) (overruling *Parratt* to the extent that *Parratt* held that negligent behavior of officials can "deprive" a person of life, liberty or property within the meaning of the Due Process Clause of the fourteenth amendment). In *Parratt*, a prisoner's mail order hobby kit was lost due to the negligence of prison employees. Although the Supreme Court agreed that this amounted to a deprivation of property under color of law, the Court held that it was not a due process violation: "Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure." *Id.* at 543, 101 S.Ct. at 1917. Similarly, the fact that Games was not accorded a pre-deprivation review was the result of the unauthorized failure of defendants' agent (Diversified) to follow established procedure.

The Court made the same point even more strongly in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In that case, prison officials negligently failed to take steps to protect the plaintiff, an inmate, from another inmate who had threatened him. The plaintiff was attacked and seriously injured. Although the plaintiff was deprived of a liberty interest in the right to be secure from physical harm, the court found no due process violation: "[L]ack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent.... The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials." *Id.* at 347–48, 106 S.Ct. at 670 (citation omitted).

In other words, the Due Process Clause does not create a constitutional cause of action for negligent acts committed under color of law.

Finally, the Court went so far as to overrule part of its decision in *Parratt* to the extent that *Parratt* stood for the proposition that "mere lack of due care by a state official may 'deprive' an individual of life, liberty, or property...." *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). In *Daniels*, the Court noted that historically the guarantee of due process had been applied only to *deliberate* decisions by government officials to cause a deprivation of life, liberty or property, *id.* at 331, 106 S.Ct. at 665, and held that the Due Process Clause of the fourteenth amendment does not provide a remedy for negligent behavior by government officials, *id.* at 336, 106 S.Ct. at 667.

The Court's decision in *Parratt* was influenced in part by the availability in that case of an adequate post-deprivation remedy under state tort law. Likewise, ED and USA Funds provide a post-deprivation remedy for borrowers whose tax refunds are intercepted. Both ED and USA Funds will conduct reviews even after intercept has occurred. Declaration of Jack Reynolds at ¶ 12, Dkt. 48A at A–38; Transcript at 34; *see also* Dkt. 60 at A–12 (notice from IRS informing Games that his refund had been intercepted and referring any questions or objections to ED). There is no evidence that Games sought to avail himself of this post-deprivation procedure.

The fact that Games' request for a review was not granted as a result of negligence is not in and of itself a violation of his due process rights. Games contends, however, that the use of Diversified and other collection agencies by USA Funds to receive responses to the 65–day letter is a due process violation because it is likely to lead to frequent mistakes such as the one made in his case. The court must apply the test set forth in *Mathews v. Eldridge*.

Plaintiff's property interest in his tax refund again satisfies the first prong of the test. As to the risk of erroneous deprivation, Games fails to point to a single in-

stance other than his own in which one of the collection agencies failed to forward a request for a review. Transcript at 7 ("[T]his is only one case and this is the only incident that we are aware of...."). In 1988 alone, ED referred approximately 596,287 Guaranteed Student Loan accounts to IRS for intercept. Declaration of Jack Reynolds at ¶ 9, Dkt. 48A at A–36. A substantial portion of these accounts were assigned to ED from USA Funds. Transcript at 35. USA Funds is unaware of any other such failure. Tharp Affidavit at ¶ 9 (Dkt. 53). As to the second prong of the *Mathews v. Eldridge* balance, it appears on this record that the risk of erroneous deprivation because of the use of collection agencies to receive debtors' requests is small. In analyzing the procedure under the third prong of the test, the court notes USA Funds' role in the TRIP program is limited to assigning past-due accounts to ED for collection via the TRIP program, generating the 65–day letters, and conducting reviews. Requiring ED and USA Funds to negotiate repayment agreements and provide documents in addition to their current responsibilities would strain their limited resources. Games' suggestion that USA Funds and ED eliminate use of collection agencies to perform these ministerial tasks is very burdensome relative to the minimal chance of similar miscommunications. The balancing test of *Mathews v. Eldridge* dictates the conclusion that use of the collection agencies to receive responses to the 65–day letter is not a violation of due process.

Games also seeks to challenge the procedures followed by USA Funds and ED when they conduct reviews of student loans prior to intercept. The court declines to review those procedures at this time because in so doing this court would be rendering an advisory opinion. Games never received a hearing; the procedures about which he complains were never applied to him. As previously rehearsed, the defendants' failure to accord Games a pre-deprivation review and their use of Diversified to receive responses to the 65–day letter were not violations of Games' due process rights. Consequently, the court will not order defendants to return Games' intercepted tax refund and accord him a pre-deprivation review.

A decision by this court concerning the procedures utilized by defendants in conducting pre-deprivation reviews would therefore serve no other function except to advise defendants as to how such reviews should be conducted. *See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3529.1 at 296 (2d ed. 1984) ("[A court] may refuse to give an 'advisory opinion' on questions rendered unnecessary by the balance of its decision...."); *Stearns v. Johns–Manville Sales Corp.,* 770 F.2d 599, 601 (6th Cir.1985) (declining to construe a statute which the balance of the opinion held was not applicable to the case); *Environmental Defense Fund v. Alexander,* 614 F.2d 474, 480 (5th Cir.) ("If the defense [of laches] is established, the court's musings about how the case might have been decided on the merits if timely filed and if we could grant relief would surely be the rendering of an advisory opinion in violation of the constitutional strictures."), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980).

Further, Games has not yet sought a post-deprivation review. Therefore, any challenge to the procedures which might be followed by defendants in conducting such a review is not ripe for decision by the court at this time. The court "should not undertake the role of [a] helpful counselor[ ]...." 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532.1 at 114 (2d ed. 1984). In order to consider the procedures that would be followed in a post-deprivation review, the court must speculate that (i) Games will seek such a review; (ii) that the procedures utilized in such a review would be the ones anticipated by Games; and (iii) that the outcome of the review would be adverse to Games. The court would be giving advice rather than deciding a concrete case or controversy. In essence, the court would be instructing USA Funds and ED on the kinds of post-deprivation review procedures they should employ. The court should not needlessly undertake to examine the consti-

tutional sufficiency of ED and USA Funds' review procedures, and it heeds the admonition of the Third Circuit in *Anderson* that "[w]e do not find persuasive the reasoning of those courts that use the Due Process Clause to establish detailed procedural requirements for agencies and officials administering TRIP." 888 F.2d at 995.

The court finds that the negligent failure on the part of USA Funds and ED to provide Games with a pre-deprivation review and the use of collection agencies such as Diversified to receive responses to the 65–day letter were not due process violations. Plaintiff's motion for summary judgment on these issues will be denied. Defendants' motion for summary judgment will be granted. Plaintiff's challenge to the procedures utilized by USA Funds and ED in reviewing student loans that are set for intercept will be dismissed without prejudice for the reasons stated above.

THE FDCPA CLAIM

Plaintiff alleges USA Funds violated the Federal Debt Collection Practices Act, 15 U.S.C.A. §§ 1692 *et seq.* ("FDCPA" or "the Act") by sending the 65–day letter and the salary offset notice. He seeks $5000 statutory damages from USA Funds for these alleged violations. Games has moved for partial summary judgment on the issue of whether USA Funds is a debt collector subject to the FDCPA and whether USA Funds violated the Act. USA Funds has moved for summary judgment on the grounds that it is not a debt collector subject to the Act, or in the alternative, that it did not violate the Act. It has also moved for summary judgment on its counterclaim.

The Federal Debt Collection Practices Act is intended "to eliminate abusive debt collection practices by debt collectors [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged...." 15 U.S.C.A. § 1692(e). The Act makes it unlawful for debt collectors to use abusive tactics while collecting debts for others. It imposes civil liability only upon "debt collectors" as defined by the Act. 15 U.S.C.A. § 1692k; *In re Scrimpsher,* 17 B.R. 999, 1011 (Bankr.N.D. N.Y.1982). Consequently, if USA Funds is not a "debt collector" within the definition provided by the Act, the requirements of the FDCPA are inapplicable to its actions.

In order to determine whether USA Funds is a debt collector within the meaning of the FDCPA, the court must examine in greater detail the relationship between USA Funds and the Department of Education, the role USA Funds plays in the Guaranteed Student Loan Program, and USA Funds' participation in the collection of student loans by the TRIP and federal salary offset programs.

USA Funds is a private, not-for-profit corporation which operates as a guarantee agency participating in the Stafford Student Loan Program pursuant to the Higher Education Act, 20 U.S.C.A. §§ 1071 *et seq.* The Stafford Student Loan Program "makes low interest loans to students to pay for their costs of attending post-secondary schools. Lenders loan their own funds and ... a guarantee agency insures against loss." 34 C.F.R. § 682.100(a) (1984). Under the program, the Federal Government reimburses State or private non-profit guarantee agencies for all or part of insurance claims they pay to lenders. 34 C.F.R. § 682.100(a)(1) (1984).

Generally, a qualified student such as Eric Games receives a loan from an ordinary lender, such as a bank (in this case, Wilmington Trust Co.) to attend an eligible institution of higher learning like Goldey Beacom College. The loan is insured by a State or private guarantee agency such as USA Funds. The guarantee agency enters into various agreements with ED entitling it to certain benefits.

As a guarantee agency, USA Funds has entered into numerous agreements with ED.[6] In 1966 USA Funds entered into an agreement with ED whereby USA Funds would receive Federal "advances" to strengthen its reserve fund and better en-

---

**6.** Many of the agreements were actually entered into with the Department of Health Education, and Welfare, the predecessor of the Department of Education. For convenience, the Court will refer to both the Department of Education and its predecessor agency as "ED".

able it to insure student loans. "Terms and Conditions Covering Advances Made Under Section 422 of the [Higher Education] Act," Dkt. 52 at A–30–32 (hereinafter "Contract for Advances"). Also in 1966 and again in 1977, USA Funds entered into an agreement whereby ED agreed to pay to lenders a portion of the interest payments on loans insured by USA Funds. "Agreement Pursuant to Section 428(b) of the Higher Education Act of 1965 with a State or Private Non–Profit Institution or Organization for Coverage of Its Student Loan Insurance Program Under the Interest Benefit Provisions of Section 428(a) of the Act," Dkt. 52 at A–18–21 (hereinafter "1966 Basic Agreement"); "Agreement Pursuant to Section 428(b) of the Higher Education Act of 1965, as amended, with a State or Private Non–Profit Institution or Organization for Coverage of its Student Loan Insurance Program under the Interest Benefits Provisions of Section 428(a) of the Act," Dkt. 52 at A–22–24 (hereinafter "1977 Basic Agreement"). In 1977, USA Funds and ED also entered into a reinsurance agreement whereby ED agreed to reimburse USA Funds for 80% of the losses resulting from paying lenders' insurance claims on defaulted student loans. "Agreement for Federal Reinsurance of Loans Pursuant to 428(c) of the Higher Education Act of 1965, As Amended," Dkt. 52 at A–25–28 (hereinafter "Reinsurance Agreement"). A subsequent agreement increased the reinsurance amount to 100% of USA Funds' losses. "Supplemental Guaranty Agreement for Federal Re–Insurance of Loans, Higher Education Act of 1965, As Amended," Dkt. 52 at A–33–37 (hereinafter "Supplemental Reinsurance Agreement").

In order to receive the benefits provided by these agreements, USA Funds was obligated to satisfy certain requirements. For instance, all of the agreements require USA Funds to submit certain reports and information to ED. In addition, the 1977 Basic Agreement requires USA Funds to notify ED of the transfer of any loan note insured by USA Funds and limits the persons to whom the note may be transferred. 1977 Basic Agreement ¶¶ 3–4, Dkt. 52 at

A–23. The Reinsurance Agreement and the Supplemental Reinsurance Agreement require USA Funds to assure ED with respect to claims on a reinsured loan that "(a) the terms of such loan comply with all [USA Funds'], State and Federal requirements, (b) that all reasonable efforts have been made to collect the loan, and (c) the loan is in default. . . ." Reinsurance Agreement ¶ 5, Dkt. 52 at A–26; *see also* Supplemental Reinsurance Agreement ¶ 5, Dkt. 52 at A–35. The two reinsurance agreements also require that USA Funds "establish and maintain such administrative and fiscal procedures as are necessary to assure proper and efficient administration of its Student Loan Program. . . ." Reinsurance Agreement ¶ 4, Dkt. 52 at A–26; Supplemental Reinsurance Agreement ¶ 4, Dkt. 52 at A–35. Under the Reinsurance Agreement and the Supplemental Reinsurance Agreement, USA Funds must submit any forms or procedures developed by it for use in its Student Loan Insurance Program for ED's approval. Reinsurance Agreement ¶ 9, Dkt. 52 at A–27; Supplemental Reinsurance Agreement ¶ 6, Dkt. 52 at A–35. Finally, both agreements grant USA Funds authority to allow forbearance of the loan by the lender for the benefit of the student borrower. Reinsurance Agreement ¶ 6, Dkt. 52 at 26; Supplemental Reinsurance Agreement ¶ 8, Dkt. 52 at A–36; 34 C.F.R. § 682.405(f)(8) (1984). The governing regulations contain further examples of the control exerted by ED over the guarantee agencies' administration of the GSL Program. *See generally* 34 C.F.R. part 682 (1984).

The agreements also define much of the relationship between USA Funds and the actual lenders, such as Wilmington Trust Co. For instance, USA Funds must assure ED that the terms of the loans made by the lenders comply with all relevant State and Federal requirements. Reinsurance Agreement ¶ 5, Dkt. 52 at A–26; Supplemental Reinsurance Agreement ¶ 5, Dkt. 52 at A–35. USA Funds must also assure ED that the lenders exercised due diligence in making, servicing and collecting the loans. Reinsurance Agreement ¶ 4, Dkt. 52 at A–26;

Supplemental Reinsurance Agreement ¶ 4, Dkt. 52 at A–35. USA Funds might also require the lender to submit certain information to ED. 1977 Basic Agreement ¶ 2(d), Dkt. 52 at A–23. Thus, as a guarantee agency USA Funds plays a substantial role in administering the Guaranteed Student Loan Program. However, its administration of the GSL Program may be described as "highly regulated" by ED. *See State of Delaware v. Cavazos*, 723 F.Supp. 234, 237 (D.Del.1989) (summarizing the administration of the GSL Program by guarantee agencies and noting that the program is "subject to extensive regulation").

USA Funds' role in the collection of student loans through TRIP and the salary offset program is more limited. USA Funds' participation in TRIP is delineated in a 1987 amendment to its Basic Agreements. USA Funds agreed to participate in TRIP for the 1987 tax year. Letter to Rosemary Beavers, Student Receivables Branch, ED from James C. Lintzenich, Senior Vice–President and Treasurer, USA Funds (Sept. 14, 1987), Dkt. 48A at A–42. Its participation consisted of assigning to ED any defaulted loans on which ED paid a reinsurance claim and generating a one-page form letter provided by ED (the "65–day letter") to each debtor whose account was assigned to ED. USA Funds was also empowered to resolve complaints and inquiries from debtors responding to the 65–day letter. Appendix 1, Dkt. 52 at A–46–47, A–53. The notice dated October 1, 1987 and received by Games was a 65–day letter generated by USA Funds in connection with the amendment to its Basic Agreements. After offset occurred, ED reassigned any outstanding balance to USA Funds for further collection activity. Appendix 1, Dkt. 52 at A–50.

Likewise, USA Funds' participation in the salary offset program consisted merely of verifying that the debt is in default, generating a form letter provided by ED, and assigning the debt to ED. Letter to Guarantee Agency Directors from Richard A. Hastings, Director, Debt Collection and Management Assistance Services, ED (November 1987), Dkt. 60 at A–61. The salary offset notice received by Games dated January 27, 1988 was an ED form letter generated by USA Funds in connection with its participation in the salary offset program.

■ The court now turns to the threshold issue of whether USA Funds was a debt collector within the meaning of the FDCPA when it generated and sent the two notices. The FDCPA defines "debt collector" generally as:

> (6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . .

15 U.S.C.A. § 1692a(6). The Act also lists numerous exceptions to the general definition. *See id.* §§ 1692a(6)(A)–(F).

USA Funds first argues it is not a debt collector as that term is generally defined by the Act because debt collection is not its principal business purpose. USA Funds' Opening Brief in Support of its Motions for Summary Judgment at 10 (Dkt. 52) (hereinafter "Dkt. 52 at ___"). Although "[t]he primary persons intended to be covered [by the Act] are independent debt collectors," S.Rep. No. 95–382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695, 1697, Congress did not limit the scope of the Act to those entities whose sole or principal purpose is debt collection. Instead, Congress extended coverage of the Act to entities that regularly collect or attempt to collect debts as well as those whose principal business is debt collection. For instance, a mortgage servicing company is not considered a debt collector when it acquires loans originated by others and not in default at the time acquired. However, to the extent the mortgage servicing company receives delinquent accounts for collection it is a debt collector with respect to those accounts. 8 K. Lapine & B. Bash, *Banking Law.* § 155.07[3] at 155–39–40 (1989); *see also* S.Rep. No. 95–382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad-

min.News 1695, 1698. The word "regularly" means "normally, usually, or customarily." 8 K. Lapine & B. Bash, *Banking Law* § 155.07[3] at 155-35-36 (1989) (citing FTC Interpretive Letter No. 00073, Jan. 3, 1978). The Act was not intended to cover an entity that collects a debt for another in an isolated instance, but it does apply to entities that collect debts for others "in the regular course of business." S.Rep. No. 95-382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695, 1697-98. The notices sent to Games were not "isolated instance[s]," but rather, they were part and parcel of USA Funds' activities pursuant to its relationship with ED. USA Funds issues these notices in the regular course of its business as part of its participation in the TRIP and salary offset programs. Dkt. 60 at A-110 (deposition of Kevin Tharp) (stating that "thousands" of 65-day letters were sent by USA Funds in 1987). The conclusion is inescapable that USA Funds regularly collects or attempts to collect debts within the meaning of 15 U.S.C.A. § 1692a(6).

USA Funds' next argument is that it is not a debt collector because it is not collecting or attempting to collect debts owed or due *another*. USA Funds argues that it acquired the debt upon payment to the lender and consequently, it was attempting to collect debts owed to itself. The argument does not fly. Although USA Funds may have had title to Games' debt at one time, the guarantee agency must assign the loan to ED prior to sending the 65-day letter. Dkt. 60 at A-138 (deposition of Kevin W. Tharp).[7] Title technically rested in ED at the time the notices were sent.

Therefore, for purposes of the notices, the debt was owed or due to ED, not USA Funds.[8] Even though the assignment to ED was conditional and temporary, it was an assignment nevertheless. Thus, for purposes of sending the notices the debt was owed or due to another, and USA Funds meets the general definition of a debt collector set forth in section 1692a(6).

USA Funds argues that even if it is a debt collector under the general definition of section 1692a(6), one or more of the exceptions to the general definition apply. The Act lists six exceptions, of which three are relevant to this case:

The term [debt collector] does not include—

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

. . . .

(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

. . . .

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; . . . .

15 U.S.C.A. § 1692a(6)(A), (C) & (F).

USA Funds argues that it is a creditor and thus excluded from coverage under the

7. There is some confusion as to the exact date of the assignment. Although USA Funds must postmark the assignment prior to sending the 65-day letter, Dkt. 60 at A-138 (deposition of Kevin W. Tharp), the letter indicating assignment of the loan was dated October 2, 1987, Letter from James C. Lintzenich to Jack C. Reynolds (October 2, 1987), Dkt. 52 at A-56-57, whereas the 65-day letter was dated October 1, 1987. However, initial information regarding assignment was sent in September 1987. *See* letter from Cynthia A. Backer, Manager, Default Collections USA Funds to Timothy G. Moore, General American Credits, Inc. (September 11, 1987), Dkt. 52 at A-6-8. Since USA Funds insists—and Games does not dispute—that it ef-

fected assignment prior to sending the letter, the Court will assume that the loan was in fact assigned to ED prior to the time the 65-day letter was sent.

8. In light of this finding, the court will not address whether USA Funds would be a debt collector within the meaning of 15 U.S.C.A. § 1692a(6) if it had retained title to the loan at the time the notices were sent. *See generally Holmes v. Telecredit Service Corp.*, 736 F.Supp. 1289, 1291-93 (D.Del.1990); *Kimber v. Federal Financial Corp.*, 668 F.Supp. 1480, 1485 (M.D. Ala.1987).

Act by section 1692a(6)(A) above.[9] The Act defines a "creditor" as:

> [A]ny person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

15 U.S.C.A. § 1692a(4). For purposes of sending the notices, USA Funds is not a creditor. Although it may have guaranteed the loan, it did not offer or extend credit. The regulations specifically define "lender" for purposes of the Guaranteed Student Loan Program. *See* 34 C.F.R. § 682.200. That definition does not encompass guarantee agencies, which are defined elsewhere in that subsection. Further, at the time the notices were sent, the debt was not owed to USA Funds. For purposes of sending the notices in question, USA Funds is not a creditor within the meaning of the Act.

Even if USA Funds were considered a creditor under the definition set out in section 1692a(4), it falls under the exception for assignees. Section 1692a(4) excludes from the definition of creditor "any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." The lender did not transfer title to the debt to USA Funds until after default. Had Games made timely payments, USA Funds would never have received title to the loan. It is clear, therefore, that Wilmington Trust Co. transferred the loan to USA Funds after default to facilitate collection.

USA Funds also argues that it should be excluded from coverage by the FDCPA under the exceptions for collection activity that "(ii) concerns a debt which was originated by such person; [or] (iii) concerns a debt which was not in default at the time it was obtained by such person; . . . ." 15 U.S. C.A. § 1692a(6)(F)(ii) & (iii). As to section 1692a(6)(F)(iii), however, the loan was in

default when it was transferred to USA Funds. Wilmington Trust Co. declared the loan in default on May 15, 1986. Notice of Default, Dkt. 48A at A–7. It transferred the loan to USA Funds when USA Funds paid the loan under its guarantee agreement on or about June 30, 1986. Dkt. 48 at 10. USA Funds has repeatedly asserted, in this lawsuit and elsewhere, that the loan was properly placed in default status. *See, e.g.,* Letter from Karri L. Hofer, Default Collections Representative, USA Funds to John X. Denney, Esq., Games' attorney (February 18, 1988), Dkt. 60 at A–445. USA Funds cannot successfully argue that the loan was not in default when it was transferred to USA Funds from Wilmington Trust Co. on or about June 30, 1986. USA Funds appears to argue that it first acquired an interest in the loan when it guaranteed the loan in February 1985. That may be true in the sense that USA Funds had an interest in seeing that no default occurred so that its obligation to insure the loan would never be triggered. However, USA Funds did not acquire an *ownership* interest in the loan until the transfer from Wilmington Trust. Therefore, for purposes of section 1692a(6)(F)(iii), the loan was in default when it was obtained by USA Funds.

Section 1692a(6)(F)(ii)'s exception for originators is also inapplicable here. USA Funds argues, and the court agrees, that the exception for persons who "originate" a debt refers to persons other than the original lender. *See* Dkt. 52 at 15. Section 1692a(6)(A)'s exception for creditors already exempts original lenders from the requirements of the FDCPA. Consequently, limiting the exception in section 1692a(6)(F)(ii) to original lenders would render it repetitive and superfluous. Nevertheless, the exception for persons who originated a loan does not apply to USA Funds in this instance. The regulations governing the Stafford Student Loan Program define "origination" narrowly as:

> A special relationship between a school and a lender, in which the lender del-

---

9. It appears that this exception was intended to cover creditors themselves as well as their employees. *Kimber v. Federal Financial Corp.,* 668

F.Supp. 1480, 1484 (M.D.Ala.1987) (citing S.Rep. No. 95–382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695).

egates to the school substantial functions or responsibilities normally performed by lenders before making loans. In this situation, the school is considered to have "originated" a loan made by the lender. [ED] determines that "origination" exists if—

(a) A school determines who will receive a loan and the amount of the loan; or

(b) The lender has the school verify the identity of the borrower or complete forms normally completed by the lender.

34 C.F.R. § 682.200.

USA Funds argues that the term "originated" in the FDCPA is broader than the definition provided in the regulations governing the Guaranteed Student Loan Program's regulatory definition set out above. While that may be the case, the two provisions can and should be harmonized.[10] In this instance, that is easily accomplished. The definition of "origination" contained in the regulations extends beyond the actual lender to the school when it performs certain information-gathering tasks. This dovetails with the argument that the exception in section 1692a(6)(F)(ii) applies to entities other than the original lender. The "origination" definition in the regulations does not include guarantee agencies. Thus, under the governing regulations USA Funds could not have originated the loan.

Finally, USA Funds argues that sending the notices should not subject it to the FDCPA because of the exception for "any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C.A. § 1692a(6)(C). USA Funds concedes it is neither an officer nor an employee of the Federal government. Nevertheless, it argues that for purposes of the TRIP and the salary offset programs it

was "merely ... a conduit" for ED and as such should be protected by the exception:

It is undisputed that the complete text of the [notices] was provided by [ED]. USA Funds merely addressed and mailed the notices on behalf of [ED].

In a situation such as this, where USA Funds has absolutely no discretion as to the form or content of the notice, which is sent in order to implement a Federal program should be construed as an attempt by the United States to collect a debt, bringing the matter within the scope of the exclusion provided for in § 1692a(6)(C).

Dkt. 52 at 16 (citations to the summary judgment record omitted). Although the court does not entirely agree with USA Funds' analysis, the court does find that USA Funds' actions in sending the notices are within the scope of the protection afforded by section 1692a(6)(C).

The court finds persuasive the reasoning of the Third Circuit Court of Appeals in *Heredia v. Green*, 667 F.2d 392 (3d Cir. 1981). In that case, the Landlord and Tenant Officer of the Philadelphia Municipal Court ("L & T Officer") was sued for violations of the FDCPA in connection with his sending two "Municipal Court Notices of Termination of Lease" ("Notices") to tenants on behalf of landlords. The L & T Officer is appointed by the President Judge of the Philadelphia Municipal Court. *Id.* at 393. The Notices demand full payment of fees, late charges and unpaid rent and inform the allegedly delinquent tenants that eviction proceedings will commence if payment is not made within five days. *Id.* The plaintiffs in that case, two Notice recipients, argued that since the private landlords could send such notices themselves, the L & T Officer was acting in his private rather than his official capacity. The Court of Appeals held that the L & T Officer was protected by the exception in

---

**10.** General and special statutes may be read in pari materia. Where one statute addresses a subject generally and a second statute deals with part of the same subject in a more detailed way, the two should be harmonized where possible. 2A Singer, Sutherland Statutory Construction § 51.05 at 499 (4th ed. 1984); *see also*

*Creque v. Luis*, 803 F.2d 92, 94 (3d Cir.1986). Although the definition of "origination" at 34 C.F.R. § 682.200 is a regulation and not a statute, it can and should be harmonized with the term as used in section 1692a(6)(F)(ii)'s exception.

section 1692a(6)(C). The Court reasoned as follows:

> [T]he President Judge has specifically authorized his Landlord and Tenant Officers to serve the Notice in question. The L & T Officer has little discretion in this regard. The order from the President Judge authorized and instructed the Officer to serve the Notice when requested to do so by a private landlord in Philadelphia.

> Finally, it is important to note that not only the form of the notice in question but also the entire procedure involved in this case was designed and approved by the President Judge. There is an important governmental interest served by this procedure that we should not disturb.

*Id.* at 395 (citation omitted).

*Heredia* is, of course, distinguishable from this case because the L & T Officer was a government official. However, his status as a government official did not bring him within the purview of section 1692a(6)(C)'s exception. In order to except his actions from the requirements of the FDCPA, the appellate court had to find that his actions were performed within the scope of his official duties. The court reasoned that the fact that the President Judge designed and approved the procedure indicated that the L & T Officer was performing an official duty. In this case, USA Funds is contractually bound to follow a procedure for sending out TRIP and salary notices, that was designed and approved by ED. Like the L & T Officer in *Heredia*, USA Funds had no discretion as to the content of the notices. The entire procedure is described in USA Funds' contractual arrangements with ED and in the governing statutes and regulations. USA Funds' sending of these notices under the direction of ED is analogous to the L & T Officer's performance of his "official" duties at the behest of the President Judge.

Furthermore, USA Funds administers a federal government program involving federal dollars. Sending the notices is only one aspect of USA Funds' administration of the Guaranteed Student Loan Program. The Guaranteed Student Loan Program may be administered by either a State guarantee agency or a private non-profit agency such as USA Funds. 20 U.S.C.A. § 1072(a)(1) ("[T]he Secretary [of Education] is authorized to make advances to any State with which the Secretary has made an agreement ... for the purpose of helping to establish or strengthen the reserve fund of the student loan insurance program covered by that agreement. If for any fiscal year a State does not have a student loan insurance program covered by an agreement ... the Secretary may make advances for such year for the same purpose to one or more nonprofit private institutions.... The Secretary may make advances ... both to a State program ... and to one or more nonprofit private institutions or organizations ... in that State if he determines that such advances are necessary in order that students in each eligible institution have access ... to a student loan insurance program...."); 34 C.F.R. § 682.200 (1984) ("*Guarantee agency:* A *State or private* nonprofit agency that administers a student loan insurance program.") (emphasis added). It would be incongruous to hold USA Funds to the requirements of the FDCPA when it administers the very same federal government loan program as the State guarantee agencies that are excepted by section 1692a(6)(C)'s exception for government actors. Since State guarantee agencies would not be subject to the FDCPA for their participation in the GSL Program, private guarantee agencies like USA Funds should likewise be protected. This protection extends to all aspects of the private guarantee agencies' administration of the Guaranteed Student Loan Program.

Moreover, as stated above, USA Funds administers a federal government program involving federal funds. In some sense, therefore, it is a federal government actor. Plaintiff himself obviously views USA Funds as a federal actor. Games has filed a lawsuit against *both* ED *and* USA Funds for violations of his due process rights. Since only federal and state government actors can violate the due process clauses of the fifth and fourteenth amendments to the United States Constitution, plaintiff by

his own actions in this lawsuit has implicitly acknowledged that USA Funds is a government actor of some sort.

Finally, and alternatively, the sending of these notices by USA Funds and other private guarantee agencies in connection with their administration of the GSL Program is simply not the kind of activity Congress intended to regulate. The intent of the FDCPA was to eliminate abusive debt collection practices by debt collectors. The Act specifically prohibits debt collectors from engaging in any conduct the natural consequence of which would be to harass, oppress or abuse any person in connection with collecting the debt. 15 U.S.C.A. § 1692d. When it passed the FDCPA, Congress had in mind such abusive practices as:

> obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process.

S.Rep. No. 95–382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695, 1696.

The definitional section of the FDCPA is not a model of clarity. Nevertheless, "[i]n reading it, ... one cannot take a clause out of context and give it a meaning which is inconsistent with the overall purpose of the legislation. Rather, if the definitional section is ambiguous our effort should be to interpret it in a manner which preserves rather than destroys the legislative purpose...." *Heredia v. Green,* 667 F.2d 392, 399 (3d Cir.1981) (Gibbons, J., dissent-

ing). The primary business purpose of USA Funds is administration of the Guaranteed Student Loan Program. While USA Funds regularly sends these notices, such activity is incidental to its primary function of administering the federal GSL Program. No assertion has been made that USA Funds in engaged in abusive or harassing tactics. Moreover, unlike a typical debt collector, USA Funds is involved with Guaranteed Student Loans from the moment the loan is made. Whereas a debt collectors' first communication with a borrower is likely to be a collection communication, USA Funds' first contact with the borrower in this case was the promissory note itself, which was generated by USA Funds and bore its logo. In addition, USA Funds was authorized to resolve complaints from the borrower and exercise loan forbearance in appropriate cases, powers not typically possessed by ordinary debt collectors. I am convinced that Congress did not intend the FDCPA to apply to guarantee agencies administering the GSL Program in cooperation with ED. I therefore construe section 1692a(6)(C) to except USA Funds from the requirements of the FDCPA when it sends the TRIP Program 65–day letters and the salary offset notices provided by ED as part of its administration of the GSL Program.[11]

For the reasons stated above, it is held that USA Funds is not a debt collector under the FDCPA. In light of this holding, it is unnecessary for me to reach the merits as to whether USA Funds violated any requirements of the Act. USA Funds' motion for summary judgment on the issue of whether it is liable under the FDCPA will be granted. Games' motion for partial summary judgment on his FDCPA claims will be denied.

---

**11.** The court is aware that the United States District Court for the Southern District of New York has held that the FDCPA applies to debt collection agencies employed directly by ED to send the TRIP 65–day letters to student borrowers whose loans are guaranteed directly by ED itself. *Richardson v. Baker,* 663 F.Supp. 651, 655 (S.D.N.Y.1987). Nevertheless, that court's reasoning should not extend to guarantee agencies such as USA Funds. The debt collection agencies discussed in *Richardson* do not participate in the Guaranteed Student Loan Program.

Their first communication with the student borrower is likely to be a collection communication. By contrast, guarantee agencies such as USA Funds are involved with the GSL Program from the start. As stated above, USA Funds' first contact with the borrower in this case was the promissory note itself, which was developed for the program by USA Funds and bore its logo. *See* Dkt. 52 at A–1–3. Further, USA Funds is authorized to exercise loan forbearance, a power not given to independent debt collectors contracting with ED.

### USA FUNDS' COUNTERCLAIM

USA Funds has filed a counterclaim against Games seeking the balance outstanding on his student loan plus interest, costs of collection and attorneys fees. Dkt. 9, ¶¶ 23–28. Games argues by way of defense that Wilmington Trust Co. improperly declared the loan in default, which prevented payment of the loan by the Delaware National Guard on his behalf. He requests the court to declare the loan not in default. USA Funds has moved for summary judgment on its counterclaim. In reviewing USA Funds' motion for summary judgment, the court "must view all facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment," in this case, Games. *Wilmington Housing Authority v. Pan Builders, Inc.*, 665 F.Supp. 351, 353 (D.Del.1987) (citing *Adickes v. Kress Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

On or about January 15, 1985 plaintiff Games filled out an application for a guaranteed student loan at the financial aid office of Goldey Beacom College. This application incorporated a promissory note. Across the top of the application in large print were the words "USA FUNDS Application for a Guaranteed Student Loan." Dkt. 52 at A–1. The application indicated that the Lending Institution would be Wilmington Trust and that the lender's address was "c/o USA Funds", Indianapolis, Indiana. Dkt. 52 at A–1.

Games signed the promissory note for a $2,500 loan. The promissory note indicated that the signatory had read, understood and agreed to the conditions on the reverse side of the application and the terms of the accompanying Notice of Loan Guarantee and Disclosure Statement. Dkt. 52 at A–1; Dkt. 60 at A–18. The terms incorporated by the promissory note included the following:

> **V. Default** I will be in default and you [12] have the right to give me notice that the whole outstanding principal balance plus any unpaid interest I owe is due and payable at once (subject to any law which gives me a right to cure my default) if: 1) any payment has not reached you within the number of days after it is due as specified on the Notice of Loan Guarantee and Disclosure Statement; or 2) I fail to notify you of a change in my name, address or school enrollment status within 10 days....
>
> **VII. Additional Agreements** .... 2) Any notice required to be given to me will be effective when mailed by first class mail to the latest address you have for me.... 4) If USA Funds is required under its guarantee to repay my loan(s) because I have defaulted, USA Funds will become the owner of this Note and as my creditor will have all the rights of the original lender to enforce this Note against me....
>
> **VIII. Deferment** You will let me pay interest only, if such interest is not paid by the United States Government, and let me defer making principal payments on this Note as provided below if my repayment period has begun, I am not in default, and I can provide you with written evidence that I qualify for the deferment:.... 2) For periods not exceeding 3 years for each of the following while I am a) on active duty in the Armed Forces of the United States....

Dkt. 52 at A–2; Dkt. 60 at A–20. Games was required to begin repaying the loan six months after the date on which he ceased carrying at least one-half of a normal full-time academic work-load. ¶ 2 of Promissory Note, Dkt. 52 at A–2; Notice of Loan Guarantee and Disclosure Statement, Dkt. 52 at A–3.

On May 31, 1985, Games ceased being enrolled on at least a half-time basis at Goldey Beacom College. Notice from Goldey Beacom College to Wilmington Trust Co. (Oct. 24, 1985), Dkt. 48A at A–14. Under the terms of his loan as set forth in the promissory note and the Notice of Loan Guarantee and Disclosure Statement, Games was required to begin repayment of

---

**12.** According to the terms of the note, "I" means the borrower and "you" means the lender or other holder of the note. See ¶ VII of the Promissory Note, Dkt. 52 at A–2; Dkt. 60 at 20.

the principal six months later on December 1, 1985.

Games made no payments on the loan. Wilmington Trust Co. declared the loan in default May 15, 1986. Pursuant to its guarantee obligation, USA Funds paid the defaulted loan on or about June 30, 1986. Dkt. 48A at A–1. At the same time, Wilmington Trust Co. transferred title to the loan to USA Funds.

In June 1984 Games enlisted in the Delaware National Guard. He was called into duty for training from February 20—June 30, 1986. In January 1986 Games informed Goldey Beacom College that he would be in National Guard training for this period. Dkt. 60 at A–463. He returned to his parents' home at the end of June 1986. In the early part of July 1986 Games was contacted by a collection agency employed by USA Funds regarding his student loan. Games states that this was the first time he became aware of the status of the loan.

On September 25, 1986, Games requested a deferment from Wilmington Trust Co. for February 20—June 30, 1986, the period he spent training with the National Guard. Dkt. 48A at A–17. Wilmington Trust Co. referred the matter to USA Funds, which determined that the loan was in default and thus ineligible for deferment. In September or early October 1987, pursuant to the TRIP Program, USA Funds conditionally transferred title to the loan to ED.

During October 1987 Games applied for partial payment of the loan by the National Guard. Dkt. 48A at A–19. By statute, the Secretary of Defense may repay a loan such as this one borrowed by a member of the National Guard under the Higher Education Act. 10 U.S.C.A. § 2171(a)(1)(A). Loans are repaid based upon each complete year of service performed by the borrower subsequent to incurring the loan. *Id.* § 2171(a). The borrower must apply for the repayment program upon reenlistment, and payment is calculated upon the yearly service anniversary of the borrower. A

loan that has not been in effect for a full year at the borrower's service anniversary is not entitled to partial year payment at that anniversary. The partial year payment will be added to the next service anniversary claim submission. Dkt. 48A at A–84–85. Thus, although Games' first service anniversary was June 1985, the loan was not yet in effect for a year, and he was not eligible for the repayment plan until June 1986, his second service anniversary. In order for a loan to be eligible for repayment, it must not be in default. Army National Guard Student Loan Repayment Program Agreement for Fiscal Year 1984 ¶ 2(d), Dkt. 48A at A–80. On October 20, 1987, the National Guard verified to USA Funds that Games' service entitled him to partial payment by the Guard. Dkt. 48A at A–18. However, because the loan had been declared in default status on May 15, 1986, it was ineligible for payment under the National Guard's repayment program.

Games claims he was entitled to a deferment during his period of full-time service with the National Guard. He claims that USA Funds' failure to grant that deferment resulted in his loan being wrongly declared in default, thus depriving him of participation in the National Guard's repayment program. USA Funds argues that Games was not entitled to a deferment during his National Guard service and that, even if he had been granted deferment, the loan was properly in default and USA Funds is entitled to repayment.

*Discussion*

According to the terms of the governing statute, regulations, and promissory note, Games loan can be placed in default if he fails to make a required payment when due, provided that the failure persists for 120 days. 34 C.F.R. § 682.200 (1984); Notes on 1986 amendments to 20 U.S.C.A. § 1080 (subsec. (e)(2)(A)) and to 20 U.S.C.A. § 1085 (subsec. (1)); Promissory Note and Notice of Loan Guarantee and Disclosure Statement, Dkt. 52 at A–2–3.[13] Therefore,

---

**13.** Games' Notice of Loan Guarantee and Disclosure Statement indicated that the loan could be declared in default if payment was 10 days delinquent. The meaning of this provision is

unclear. Construing the facts in the light most favorable to the plaintiff, the court will apply the longer 120–day delinquency period contained in the statute and in the regulations.

unless plaintiff received a deferment, the lender could have placed Games' loan in default on May 7, 1986, 120 days after the due date of the first payment on January 7, 1986.

Both the promissory note and the statute provide for deferment of periodic payments during a period in which the borrower is granted an authorized deferment. 20 U.S. C.A. § 1078(b)(1)(M); 34 C.F.R. § 682.401(b)(10) (1984); Dkt. 52 at A–2. Repayment may be deferred while the borrower is "a member of the Armed Forces of the United States." 20 U.S.C.A. § 1078(b)(1)(M)(ii); see also 34 C.F.R. § 682.508(b)(3) (providing for deferment for "[u]p to 3 years of active duty service in the United States Armed Forces"); Dkt. 52 at A–2 (providing for deferment "[f]or periods not exceeding 3 years for each of the following while I am a) on active duty in the Armed Forces of the United States...."). Games claims he was entitled to deferment during his service in the National Guard from February 20–June 30, 1986. He does *not* assert he was entitled to a deferment at the time the first payment became due on January 7, 1986. Therefore, the loan was delinquent at the time Games began his National Guard training.

A borrower is eligible for a deferment when the conditions entitling him to deferment first exist. 34 C.F.R. § 682.508(a)(1) (1984). In Games' case, the condition allegedly entitling him to a deferment arose on February 20, 1986—44 days into his delinquency period. Under the regulations, the running of the delinquency period is suspended during a deferment. *Id.* § 682.508(a)(2) (1984). Thus, assuming Games was entitled to a deferment, the 120–day period should have stopped running from February 20–June 30, 1986. The

120–day delinquency period should have resumed running on July 1, 1986, at the end of Games' service period. Since Games was already 44 days delinquent when the delinquency period would have been suspended on February 20, 1986, 76 days remained in the delinquency period when it would have resumed on July 1, 1986. The 120–day delinquency period would have ended on September 14, 1986. As of that date, Games had not made his first payment, which had been due on January 7, 1986. Therefore, if Games had been granted a deferment for his National Guard service, the lender could not have declared his loan in default until September 14, 1986. Wilmington Trust Co. declared the loan in default on May 15, 1986.

The court must therefore decide whether Games' National Guard training from February 20—June 30, 1986 entitled him to a deferment. USA Funds argues that the court need not make this determination because, even if Games had received a deferment, his loan was "in default" under the provisions of the promissory note and the governing statute and regulations no later than September 14, 1986—well over a year before Games applied for repayment by the National Guard in October 1987. However, the promissory note, statute and regulations do not *require* the lender to declare the loan in default upon the expiration of the delinquency period; they merely enable the lender to do so. If the lender never properly declared the loan in default, the fact that it could have done so prior to October 1987 is irrelevant. The court must therefore determine whether Wilmington Trust properly declared the loan in default on May 15, 1986.[14] In order to so determine, the court must decide whether Games' National Guard training entitled him to a deferment.

Consequently the court need not and does not reach the issue of whether the 10-day delinquency period set forth in the Notice of Loan Guarantee and Disclosure Statement should be applied to Games' loan.

**14.** The court recognizes that Games disputes the validity of the interception of his federal tax refund on the grounds that the loan was not "past-due" and "legally enforceable." The court declines, however, to determine whether or not

the intercept was valid. First, there has been no evidence or argument one way or the other as to whether "past-due" and "legally enforceable" are synonymous with "in default." Second, whether Games has a valid defense to the intercept should be decided in the first instance in an administrative review by either USA Funds or ED, and the court declines to circumvent established procedure in this case.

USA Funds has argued the "dual enlistment" aspect of National Guard service in support of its argument that Games is not entitled to a deferment. The U.S. Supreme Court recently heard oral argument in *Perpich v. Department of Defense*, No. 89-542 (argued March 27, 1990) (certiorari to the United States Court of Appeals for the Eighth Circuit, *Perpich v. United States Department of Defense*, 880 F.2d 11 (8th Cir.1989)). The Court's decision in that case may shed light on the "dual enlistment" aspect of National Guard service. This court will therefore reserve its decision on USA Funds' motion for summary judgment on its counterclaim until such time as the court has an opportunity to consider the Supreme Court's decision in *Perpich*.

CONCLUSION

In summary, plaintiff's motion for summary judgment in Civil Action No. 88-516 will be denied. The summary judgment motion of defendants ED and USA Funds in that case will be granted. Plaintiff's motion for partial summary judgment in Civil Action No. 88-551 will be denied. USA Funds' motion for summary judgment in that case will be granted. The court reserves its decision on USA Funds' motion for summary judgment on its counterclaim for the reasons herein stated. An order will be entered conforming to this opinion.